The Honorable United States Court of Appeals for the First Circuit is now in session. All persons having any business before this Honorable Court may draw near, give their attendance, and they shall be heard. God save the United States of America and this Honorable Court. Please be seated. Court is in session. Okay, good morning. Let's just make sure Judge Lynch is on audio. Can you hear us? Good morning, everyone. Okay, so let's call the first case. Thank you, Judge. Today's cases will be called as previously announced, and times will be as allotted to count. The first case today is number 221398, Housatonic River Initiative et al. versus U.S. Environmental Protection Agency. At this time, would counsel for the Housatonic River Initiative, Mr. Raynor, please introduce himself on the record to begin. Good morning, Your Honors. Andrew Raynor, representing the Housatonic River Initiative and the Housatonic Environmental Action League. May I request that we reserve three minutes of our time for rebuttal, and that will come off my time as I indicated to the clerk. So if I was to have eight minutes, I will now have five. Okay, you may proceed. Thank you very much. So I mentioned Housatonic River Initiative and Housatonic Environmental Action League, many of whose members are here today from Berkshire County, after fighting for 20 years, over 20 years, for a proper cleanup of the Housatonic River, which was polluted over the course of the 20th century by General Electric with PCBs, millions of cubic yards of PCBs. Mr. Raynor, believe me, the court is well prepared. Could I get you to direct your attention not to the procedural arguments, but to the merits of the hybrid cleanup proposal and your attacks on the monitored natural recovery provisions? So, Your Honor, I had asked the clerk if my two colleagues, as we divided the time, are going to address your two questions. And so if Your Honor wishes, if I may go last, I will simply talk procedure at the end, and we can address those two points. No, go ahead. Address your procedural issues. But I am anxious to hear the merits of the dispute. So whoever is next knows what the first question is. Thank you very much, Your Honor. So I will use less time to primarily talk about why mediation is not compatible with the Administrative Procedure Act. The court, I think you will find there are very few precedents about this. And I believe the court has an opportunity to write on a critical question as to how mediation and settlement should properly intersect with the Administrative Procedure Act. Okay, but let me ask you at the outset, there is nothing in the book saying you can't do mediation. Absolutely not, Your Honor. The question is how do you do it, and how should it be done. And I most importantly want to direct you to page A000158 of our joint appendix, which contains the mediation and settlement mediation approach that General Electric negotiated only for itself as the model for how dispute resolution should be done under the Administrative Procedure Act. They came up with an on-the-record mediation procedure, which was actually used in connection with this site. So if that had been done here, I respectfully submit we would not be here complaining about this. What happened here, however, were mediation sessions that were conducted in secret, not on an administrative record in which participants were paid millions of dollars. How do we know, how is this court on this review, how are the citizens to know that that was a proper process in the absence of a clear record? In the briefs, Your Honor, we'll see the parties in their briefs are disagreeing about who was there, how much influence money had in the process, whether threats were made. One brief says threats were made, another one says, another one from a party that was there actually says that they were. The government says threats were not made by General Electric. Counsel, the EPA says under the consent decree, the earlier consent decree, it was contemplated that all of the interested parties would have a chance to get together and try to work out an agreement. They came up with something and the EPA then went through notice and comment rulemaking, not rulemaking, notice and comment about the proposed hybrid disposal, which had been hammered out. So why doesn't the notice and comment period take place? Your Honor, because the essential terms were decided in the settlement negotiation. They took, they got 400 comments. If you read the municipal committee brief, they say the government accepted one. So that's an end if you look at the comparative analysis that Your Honor wants to focus on. It mentions seven times that in its analysis of the nine critical factors, the settlement agreement as a driving factor. So I respectfully submit if you consider public comments did not change the result, and the government on the record prior to asking for public comment stated publicly that it was committed to the settlement, again, I respectfully submit that was not an effective notice and comment period. It was a facade. Let me ask you, as I understand your argument, you have conceded that there is nothing in the law that precludes mediation or attempts to settle. You have conceded that had it been done differently, as GE first proposed, you would have no objection. Your case comes down to the fact that a record was not kept of the discussions during the mediation. Is there anything in the law which requires that a record be kept? So, Your Honor, I cited to the HBO case from the D.C. Circuit, which talks about why the maintaining of a record is critical to both the public... Okay, we have it. Thank you. You've answered the question. You rely on that case. So why is this unique in this particular case and that procedure, which has followed probably in... I know in the District Court of Massachusetts, Judge Bowler probably mediates... She's mediated hundreds of cases. Why can't this be mediated by an agency? Your Honor, this Court has never held that you can use a secret mediation process as part of an administrative record. This Court has never held that, and I respectfully submit it should not so hold that. It isn't, Your Honor, as I, like you, am often involved in cases before the trial court where there's mediation. But here we're talking about how do you, in an administrative procedure, under the Administrative Procedure Act, ensure that, as the HBO decision says, both the public understands all of the things that went into it, because the public has rights under the Administrative Procedure Act, and also how do you ensure that this Court, when it's reviewing what happened in that mediation, is comfortable that money didn't play a role? But let me add, whenever there's a mediation at the District Court, and again, that's District Court-ordered mediation, if something comes up on appeal, there's probably not going to be a record, because my experience with mediations is, like, you meet, you discuss things, you hopefully reach a settlement, and you go back and forth. So how are you saying that, then, for administrative cases, there has to be a record compared, I mean, contrasted to federal court mediation? Well, and the proof that there needs to be is the fact that they then said, okay, now we have to go through a public comment process. And if the public comment process had actually, for example, occurred before the mediation, that would have had an effect. If the public comment process, as I say, if a record had been kept of the mediation, the public could have commented on it instead of speculating, for example, about, as I said- Okay, but if the public comment had taken place before the mediation, then you still wouldn't know what happened in the mediation. You'd still be making the same argument, I assume, right? Well, Your Honor, if the public had had an opportunity for input before, the government's window of options would have hopefully been constrained by that important process. And so we wouldn't be ending up in a situation where people don't know how the critical decisions were made. Okay, thank you. I don't want to take away all my colleagues' time. Okay, next counsel, I believe it's- Attorney Parker, please introduce yourself on the record to begin. Good morning, Your Honors. This is Attorney Stephanie Parker from the law firm of O'Connor, Carnathan & Mack, also representing the petitioners. And I will be addressing the issue of the selection of the so-called hybrid disposal facility. My colleague, Attorney Garrison, will be addressing the MNR issue. So I just ask Your Honors to keep that in mind when you come up with your questions. So I want to launch right into, obviously, the- as I said, the so-called hybrid disposal remedy selection. And I want to start by emphasizing that although the Region uses the term hybrid disposal to describe this most recent proposed dump, it's really important to look past labels here and to look at what the dump is actually proposed to be. We're not talking about some type of 50-50 split or even anything remotely approaching that in terms of the volume of material that's going off-site versus on-site. We're talking about, of the contaminated material that's going to be taken out of the river, well over a million cubic yards of the PCV waste is proposed to go into the so-called hybrid dump. And only 100,000 cubic yards is going off-site. So if you do the math, that means that the proposed, quote, hybrid disposal is slated to accept 92% of the contaminated material taken out of the river. 92%. And the reason that's important is because the Region relies so heavily on this idea that this new dump is somehow, you know, significantly different from the dump that was proposed in 2014. And one of the reasons that they rely on is saying, oh, all this material is going off-site, but in reality, it's an extremely small fraction of material that's going off-site. So the core of our argument in terms of the remedy selection problem is that the Region did not objectively assess the factors that it needed to assess when weighing the different remedial options. And those factors, as Attorney Rayner referenced, are the selection criteria, which stem from the 2000 permit. And these nine criteria are what the Region is supposed to be guided by when it makes its remedy selection. And the Region doesn't dispute that. These are essentially guideposts for the Region. Council, Council, Council. Yes. Can we go back to what our standard of review is? I had assumed until I re-read your brief this morning that you were in agreement that the standard APA, arbitrary and capricious standard, applies. But the way you wrote your brief, you said, no, the issue before the Court is what is the remedy that is absolutely the most protective of human health and safety. That's the way you've captioned your arguments. And that made me wonder if you were asking for a departure from standard APA review, which is for arbitrariness and capriciousness. Thank you, Your Honor. No, I think that's not our intention, if that's how the brief read. I think our argument is that the Region did indeed act arbitrarily and capriciously. And the core basis for that is found when you look at the chart that we prepared in our brief and compare the Region's comparison of remedial alternatives in 2014 with its comparison in 2020. And what it did, when you go through factor by factor, the Region comes out the same under every factor as it did in 2014, as it does in 2020. The sub-conclusions, if you will, are all the same. Yet the ultimate conclusion in 2014 and 2020 is radically different. So it's akin, for example, to saying – But if it's radically different, why is that arbitrary and capricious? Agencies are known to do 180-degree turns periodically, and that doesn't per se mean it's arbitrary and capricious. Yeah, I mean, we're not saying that an agency can never change its mind or that it can never do a reversal of course. So why was it arbitrary and capricious here when it changed its mind? Because the reasoning is not adequately supported in the sense that the underlying analysis all comes out the same way that it did. When you look at the supplemental comparative analysis and you compare it to the one from 2014, even though it's not word for word in terms of the narrative the same, which of course it wouldn't be, they're writing it anew, but the actual analysis in terms of which disposal option is best comes out the same. And so all that's different is that the – Also, counsel, it is true that many of the analyses come out the same, and it's to EPA's credit that it says that. But EPA then goes on to list about ten reasons why the hybrid disposal, which was not considered in the earlier rounds, is preferable. And it explains the reasons for its change in position. So I think you have to address why all of those reasons are arbitrary and capricious. You can't just rest on the argument you're making. Well, so, for example, Your Honor, I mean, this kind of goes back to what I was saying at the beginning. I know one of the things that they rely on heavily. Okay, no, no, no, no, no. I've just asked you to address a different question, and your reply is, oh, I'm going back to my same argument, all right? Why don't I list some of the things the EPA said, and you can respond to those. 50,000 fewer truck trips hauling off PCB-contaminated waste with a much lower potential for injuries, lower greenhouse gas emissions, community acceptance, each of the towns has signed on to this, I assume, partly because it means fewer truck trips of PCB-laden material. I can go on, but why don't you start there? Why is it arbitrary and capricious for the EPA to conclude that those all support the hybrid disposal choice? Yeah, well, I mean, our argument with respect to, for example, the community support is that, first of all, community support is part of the implementability factor. The implementability factor actually comes out the same, regardless of the narrative that they use when they're getting to their final conclusion about implementability. They still find that off-site disposal best meets the implementability factor. And in terms of community support, our argument is that, effectively, the only community support that was different in 2020 came from the government level where there were large payments being made to these municipalities. But the record is absolutely replete, and the agency was inundated with negative community feedback from the actual community, meaning the residents in these areas who are most affected by the dump, not just top-level politicians. That was first time around. This time around, a number of communities signed on to the mediated conclusion, and they do not join you in this attack. The communities in the sense that, and, of course, this ties back into the concerns about the settlement and how that whole process played out and the level of involvement that the townspeople actually had, but the communities were to receive very large millions of dollars under the proposed settlement. Our argument is that it's, of course, not surprising that, at least in name, certain communities signed on, but the actual grassroots-level community support was not there for this proposal. And as I said, that's just part of the analysis that gets you to an implementability finding, which still came out in favor of off-site disposal. You mentioned the grassroots community is not in favor, but that grassroots community is part of a community of elected officials which decided to sign off. Am I correct? Well, as a technical matter, yes. The elected officials decided to sign off. As I said, we challenged that there were issues with the process in terms of whether the communities felt that they were adequately involved and aware of the settlement negotiations and mediation that led to these officials signing off and whether participation was adequate. But, you know, as I said, it's our position basically, you know, as I see them over time, but that the region is trying to fit a square peg into a round hole here. When you look at its analysis, it's trying very hard to find in favor of on-site disposal because that is what will keep the settlement agreement from unraveling. But it doesn't actually match the analysis that it performed, and that is what we're saying is the heart of the arbitrary and capricious conduct. Okay. Thank you. Next counsel, Ms. Garrison. Good morning. My name is Katie Garrison, and I represent the petitioners. I'm addressing the monitored natural recovery portions of the permit. Housatonic River sediments contaminated with PCBs are found throughout the river, 140 miles even from GE's plant, and these are a heavier type of PCBs that have been found to be resistant to natural degradation and will persist for centuries in the river if action is not taken. The permit refers to monitored natural recovery as the remedy for contaminated sediments in certain reaches. Monitored natural recovery is a regulatory term with specific requirements. First, there must be a target level of cleanup defined in advance that is expected to be achieved through natural processes. Second, there must be a reasonable timeframe within which to achieve the cleanup target level through natural processes. And third, there must be a mechanism for which contingent action can be taken if the target cleanup level is not being achieved by natural processes within that timeframe. It was arbitrary and capricious for the region to say it is adopting monitored natural recovery as the remedy for sediment in certain reaches and then rewrite the definition of monitored natural recovery to remove the basic elements. The region redefined... The EPA responds that there is in fact targets, there is a timeframe, it's fish tissue down river within 15 years and the monitoring provides that if those targets are not met, then there have to be new remedial measures. So how do you respond to those arguments? Thank you, Your Honor. The permit says that monitored natural recovery is a remedy for sediment. That's where the contamination is, the heavy PCBs attached to soil and sediment via organic particles. And the EPA says that they are much less downstream than the representation you just made to the court. That's not supported by data. They haven't really checked to see what's downstream. I believe you may be referring to this comment that 90% of the contamination is in reaches 5 through 6. That's actually an inaccurate statement. I looked to see where that came from and it really doesn't check out. They looked at different sediment depths in those upper reaches, but they only looked at the first 0 to 12 inches in Connecticut, for all of Connecticut. As I read the record, there will be treatment of reach 5B sediments and in certain reach 7 and 9 sediments and that the PCB levels are low, diffuse, stable, pose almost no human health risks and that they continue to decrease as you go further downstream. Are you saying that all of those things which are in the record are inaccurate? I am. I'm saying that that's inaccurate, yes. Okay. And what is the basis for that? What have you put in the record to challenge that other than your disagreement? Well, for one thing, we can look at the permit which says that GE will conduct baseline monitoring. That's actually something that should have been done in advance before selecting a remedy. Second, we can look at the document which the region pointed to as the compilation of all the sediment data for all of Connecticut. Why is that arbitrary and capricious? You may not agree with it, but again, argue it within the standard. Yes, I will address both. First, if I may address the Connecticut document compiled by the region. For example, in reach 14, PCB concentrations in sediments were spiking at six to eight times the clean-up standard, that one part per million clean-up standard that they set for the upper reaches. That chart is on page 1,313 of the appendix. That's looking at samples before 1998, which the region is drawing this distinction. Then they're saying, well, after 1998, it's lower. But we turn the page, and there's the data that they're pointing to from 1998 or later, and there's two data points for that same reach. Two points. That's clearly not enough of a sample size to conclude that the high level is found. Thank you. That's helpful. We'll take a look at that. Thank you. Please address the next question you were asked. Yes. How is this arbitrary? It's arbitrary and capricious because the region... Because there are only two data points? Is that the argument? Because the region, Your Honor, redefined monitored natural recovery contrary to how that term has been defined by the agency for nearly 30 years. In order to create the appearance of a remedy for contaminated sediment, that is not an actual remedy. Okay. Please be more specific. What do you mean by redefined? Yes, Your Honor. There are these three elements of monitored natural recovery. You need an actual... May I proceed? No, finish. Thank you. You need an actual performance standard. The idea of monitored natural recovery is that the river is going to clean itself to a particular level defined in advance. Okay. We're circling back. That's where you started, and the EPA responded. We have done all three of those things. Not for sediment. The permit says monitored natural recovery is going to be the remedy for the contaminated sediment. By the way, one of the standards that they point to, the downstream transport standard, that's just a measure of how many more PCBs we're adding into those reaches of the river in time. It's not... It doesn't have a level of reduction, control, or removal of actual PCBs contained into the river. With respect to... Okay. Okay. We've got it. Thank you. Okay. Thank you. Okay. Let's call the next counsel for the EPA, Mr. Hammonds. Good morning, Your Honors. Jeffrey Hammonds for the United States, and with me at counsel's table are Brian Grant, John Kilmore of the United States Environmental Protection Agency. I'm going to switch things up a little bit since Your Honors want to talk about the merits of hybrid disposal and monitored natural recovery. I will note on monitored natural recovery, as you all know from our briefs, we think they've actually procedurally waived that issue because they didn't include it in their comments on the 2016 cleanup plan, which was upheld on monitored natural recovery grounds by the Environmental Appeals Board in 2018, and those provisions are the same. You know, counsel, I do understand you have good arguments about waiver, and there were good policy reasons to say to citizenry, you need to make your objections before the agency. You can't, pardon me, sandbag them by making them later. But the citizens are quite concerned about the remedies that were chosen, and so to the extent we could get to the merits of the questions, I think that might prove to be more reassuring to everyone who is involved here. Yes, Your Honor. So on the merits of monitored natural recovery, as Your Honors noted, the main complaints that petitioners make is that there's no sediment standard, not that there's no standard, but they specifically argue we were required to have a sediment standard, that there's no timeline, that there's no contingency measure, and that's not the case. There is a standard for sediment, and it's fish biota levels across the entire river. EPA conducted a human health risk analysis in the mid-2000s that found that there is a correlation between the sediment PCB levels and fish PCB levels. At the time, in the mid-2000s, the sediment PCB levels, and particularly the Connecticut reaches, were below the human health screening level, but fish biota was not. The number one risk to human health in the Connecticut reaches was fish, and therefore EPA decided to set a standard based on fish biota since it posed the greatest threat to human health. Regarding the amount of sampling that was done, there was a lot of sampling done in the Connecticut reaches. There was a total of 155 sediment samples taken from 1998 through 2003, and the average sediment level in parts per million of PCBs in Connecticut was only 0.18. So upstream where EPA is requiring cleanup of sediment, there is a standard set of one part per million. As you can tell, the existing sediment standards, and this is just before 2003, is already five times lower than that cleanup standard, and when EPA did their human health risk assessment in the mid-2000s, their risk level was actually three parts per million for sediment. So the sediment in Connecticut is so low, it simply did not require a sediment standard, and instead EPA chose fish biota since it posed the greatest risk to human health. And so moving on to hybrid disposal. Hybrid disposal is protective and safe, and the consent decree invested EPA with sole and broad authority to determine what meets the requirements of that consent decree, and this court's precedent under the arbitrary and capricious standard has found when ruling on appeals of permitting decisions, EPA's permitting decisions will be upheld so long as they have support in the record and a rational basis. And our briefing has provided all of EPA's basises and the support in the record for it. The key argument that they're making is if you look at the nine criteria, that in fact even after consideration of the hybrid disposal, without consideration of the additional benefits including sediment benefits, that the analysis pretty much comes out the same, that the total removal of PCB to an offshore site comes out pretty much the same as it did in the 2016 proposal. So what is your response to that? So as your honors probably recognize, we did argue in the briefing below that we think they actually waived that argument too. Sure. But putting waiver aside, we respectfully disagree. It's simply not the case that if you look at 2016 and 2020, that the conclusions are the exact same. And not to throw my colleagues at EPA under the bus, but in 2018 the Environmental Appeals Board found they committed clear error in adopting their off-site only disposal requirements. And as your honors know, clear error is not a low barrier for the EAB to find clear error in all off-site disposal means EPA really needed to go back and take a hard look at these issues. And that's what they did. And there's one, as your honors have pointed out, one really important distinction between 2016 and 2020. In 2016 there was strong community opposition to the on-site options considered. Fast forward to 2020 and the Municipal Committee, which represents the five towns that are going to be most impacted by this cleanup, support hybrid disposal. That support for hybrid disposal is due in part because unlike in 2016, there's going to be a limit on the amount of PCBs that are going to be put in the upland disposal facility. And the highest level of PCBs are still going to be shipped out of state. And while Council for Petitioners is right, approximately 91%, 92% of the overall sediment will be disposed in the upland disposal facility. That's not looking at the volume of PCBs. Let me ask you something. You mentioned that it's like five towns support hybrid disposal. Are there any towns that are not supporting? Obviously I don't see any as intervenors or plaintiffs.